UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA S. DIMARZO,

        Plaintiff,                    Civil Action No. 15-14037

            v.                  District Judge Robert H. Cleland
                                     Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Linda S. Dimarzo ("Plaintiff"), proceeding *pro se,* brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act.   The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).   For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #16] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #14] be DENIED.

## PROCEDURAL HISTORY

On March 21, 2013, Plaintiff applied for DIB, alleging disability  as of June 17,

-1-

2011 (Tr. 223, 245).    After the initial denial of her claim, Plaintiff requested an administrative hearing, held on December 30, 2014 in Pittsburgh, Pennsylvania (Tr. 55). Administrative Law Judge ("ALJ") Michael S. Kaczmarek presided.  Plaintiff, represented by counsel, testified (Tr. 61-92), as did Vocational Expert ("VE") Samuel Edelmann (Tr. 92-98). On May 18, 2015, ALJ Kaczmarek found that Plaintiff was not disabled (Tr. 29-48). On September 16, 2015, the Appeals Council denied review (Tr. 1-7).  Plaintiff filed the present action on November 17, 2015.

## BACKGROUND FACTS

Plaintiff, born September 13, 1965, was 49 at the time of the administrative decision (Tr. 48, 223).  She completed high school and two years of college and worked previously as an operations manager for K-Mart and a store manager for T.G. Maxx (Tr. 250).  She alleges disability due to connective tissue disease, spondylolisthesis, esophageal reflux, menorrhagia, stenosis of the larynx, hypertension, chronic pain syndrome, allergies, Attention Deficit Disorder ("ADD"), migraines, bronchiectasis (inflammation of the lungs), and a liver disorder (Tr. 249).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

She lived by herself in a second-floor  apartment in Wexford, Pennsylvania (Tr. 61). She owned a cat (Tr. 61).  She had driven herself to the hearing (Tr. 62).  She held an Associate's degree in criminal justice which she completed in part while working (Tr. 62).

-2-

She worked at T.J. Maxx until June, 2011 when she was terminated because the store she managed "was not as pretty as it should be" (Tr. 63). Her neglect of the store appearance was attributable to her focus on the "security and privacy" requirements of the job (Tr. 63-64). She received unemployment benefits from August, 2011 to the end of January, 2013, at which time she looked for other employment (Tr. 64). She worked briefly as a Dollar General Store manager but was forced to quit the job due to pain and nausea (Tr. 65). The nausea occurred about twice a week for two-hour stretches (Tr. 66). Her pain was attributable to "disc issue[s]" (Tr. 66). At least one treating source had recommended disc surgery (Tr. 66). Relief from the prescribed pain medications of Percocet and OxyContin was "hit or miss" (Tr. 67). She experienced the medication side effects of dry mouth, headache, stomach upset, and lethargy (Tr. 67). She did not experience relief from the "generic" Percocet but achieved good results from the brand name product (Tr. 68).

Plaintiff quit the Dollar General position to take a retail position with benefits but was terminated after several days for tardiness and lack of productivity because of nausea and medication side effects (Tr. 70-71). She experienced the side effect of fatigue even from an acid reflux medicine (Tr. 73). She experienced fatigue and leg swelling from working an entire shift (Tr. 72). The previous Christmas, she made a two or three-day car trip by herself to visit her mother (Tr. 71). She did not experience problems on the trip aside from the "long ride" (Tr. 71). She did not receive help performing household chores (Tr. 71).

Plaintiff began attending school full time two months after her June, 2011 termination

from T.J. Maxx (Tr. 76). She experienced shortness of breath in the fall of 2011 and underwent two trachea surgeries (Tr. 76). At present, she was unable to walk more than 12 minutes without experiencing shortness of breath (Tr. 76). She was able to lift three bags of groceries but for no more than 45 seconds (Tr. 77). She had gained approximately 40 pounds in the past three years and currently weighed around 206 pounds (Tr. 77). She did not receive regular mental health care but was prescribed medication for ADD (Tr. 78). Her current medication, Adderall was not improving the condition (Tr. 78). The medication caused stomach pain, headaches, and dry mouth (Tr. 79). She had not been incarcerated, but had been charged with writing a bad check (Tr. 80). She had tried cocaine around 15 years earlier but denied current drug use (Tr. 81). A day of regular activity was typically followed by three or four days of recovery (Tr. 82). She was unable to perform even unskilled work due to her medical conditions and medication side effects (Tr. 83).

In response to questioning by her attorney, Plaintiff reported good results from steroid injections, but discontinued them at the direction of a treating physician (Tr. 84). She testified that at the times her pain medication was ineffective, she was virtually bedridden (Tr. 85). She reported that she also took Plaquenil and Prednisone for Raynaud's disease (Tr. 86). She experienced good results from one of the "generic" Prednisone prescriptions but experienced heart palpitations from the other (Tr. 86-87). She reported that she had undergone bilateral carpal tunnel release and periodically experienced hand numbness (Tr. 87-88). She alleged daily concentrational problems and the tendency to procrastinate (Tr.

-4-

89-90).

*The ALJ then resumed questioning Plaintiff*:

Plaintiff was not receiving medication for the hand condition (Tr. 90). She did not receive followup treatment after the carpal tunnel release surgeries (Tr. 91). She experienced numbness from either carpal tunnel issues or Renaud's Disease up to 45 minutes a day but had learned how to cope with it (Tr. 91).

**B. Medical Evidence**

**1. Records Related to Plaintiff's Treatment[1]**

In January, 2012, Plaintiff reported increasing lower back pain radiating into the left leg (Tr. 484). The same month, Plaintiff reported increased fatigue, but noted that her college studies were going well and that she planned to graduate the following May (Tr. 479). Imaging studies showed mild anterolisthesis at L5-S1 (Tr. 484). In March and April, 2012, Plaintiff reported wrist and hand pain and ankle swelling and back pain (Tr. 429, 475). Treating notes state that she had been diagnosed with Raynaud's disease two years earlier (Tr. 429). She reported good results from Prednisone (Tr. 423, 429). A review of the ankles was unremarkable (Tr. 430).

May, 2012 Central Carolina Hospital treating records show that Plaintiff reported gradually increasing back and hip pain (Tr. 382). She exhibited a reduced range of motion

---

[1]Records predating the alleged onset of disability by over one year, while reviewed, have been omitted from discussion.

(Tr. 380). She was diagnosed with lumbar spondylolisthesis (Tr. 380). The following month, Plaintiff showed improved gait and muscle strength, but later in the month was diagnosed with a stress fracture of the foot (Tr. 377, 379, 483). Plaintiff reported that prescribed opiates worked only intermittently, opining that "something . . . changed with [the] manufacturer or pills" (Tr. 472). In July, 2012, Plaintiff described the lumbar pain as intermittent and exacerbated by walking (Tr. 367). She exhibited a full range of motion in all joints and a normal gait (Tr. 369, 503). A July, 2012 MRI of the lumbar spine showed a broad-based disc protrusion at L5-S1 resulting in moderate bilateral stenosis (Tr. 365, 374). The same month, Plaintiff was administered epidural steroid injections (Tr. 372). She demonstrated a full range of hip motion (Tr. 469). Notes from later the same month state that Plaintiff denied hip or foot pain (Tr. 467). August, 2012 records note a full range of leg motion with tenderness to palpation at L5-S1 (Tr. 466). She described the back pain as "mild" and "intermittent" (Tr. 516).

October, 2012 treating records note that Plaintiff was currently "looking for employment" but reported "a hard time lasting" for an eight-hour work shift without naps (Tr. 461). She rated her pain severity level at "two" and said that the back condition had improved with no range of motion limitations (Tr. 521, 523-524). She reported left foot numbness "at times" (Tr. 523). In November, 2012, she reported that an earlier steroid injection had "lasted for about three months," but declined another injection despite leg numbness and tingling (Tr. 390). EMG studies showed L5-L1 moderate radiculopathy on

-6-

the left but no evidence of neuropathy (Tr. 390, 393, 417, 720).   Plaintiff noted that she was doing "alright" and unemployed but not looking for work (Tr. 390).   She denied other health problems and appeared fully oriented with an appropriate mood (Tr. 391-392, 398).   Plaintiff reported that a prescription for Plaquenil resulted in mildly blurred vision (Tr. 421).   Treating records note a recent diagnosis of Lupus (Tr. 457).

Orthopaedic treating notes from the following month note Plaintiff's report of lower back pain for the past two or three years (Tr. 399, 415).   She reported a 70 percent improvement from the steroid injection (Tr. 399).   Sameer Mathur, M.D. noted "mild" limitations in range of motion (Tr. 401).   Plaintiff reported level "one" pain on a scale of one to ten prior to a steroid injection (Tr. 403, 405, 414).   Plaintiff reported to a family physician that she was "supposed to have surgery for her back" to remove a disc (Tr. 455).

February, 2013 records state that Plaintiff required a "gradual dose reduction of . . . narcotics" (Tr. 454).   March, 2013 treating notes by Leslie Sharpe, M.D. state that Plaintiff was considering an application for disability (Tr. 419).   Dr. Sharpe observed no acute distress, a normal range of motion and good grip strength (Tr. 419).   In May, 2013, Plaintiff reported "anxiety due to issues with pain medications" (Tr. 549).   Lab results were unremarkable (Tr. 551).

June, 2013 treating records note "a history of unspecified diffuse connective tissue disease . . ." and that Plaintiff had been referred to a pain management clinic "given her escalating use of Percocet" (Tr. 532).   Treating notes state that "it would be helpful for her

to see a psychiatrist given some paranoic behavior regarding pills being tampered with . . ." (Tr. 532).

In August, 2013, Frederick Florian, M.D. of Advanced Pain Medicine noted that Plaintiff was "now working long hours on her feet" but recommended against increasing opiate usage (Tr. 606).   Notes from two weeks later state that Plaintiff "seeme[d] to be adjusting to . . . work" (Tr. 603).   Plaintiff reported that her pain had increased since beginning 60-hour workweeks at Dollar General (Tr. 604).   The following month, Plaintiff reported that she was late to work due to pain medication side effects (Tr. 599).   October, 2013 notes state that while Plaintiff continued to work at her current job, she would be starting a new job "shortly" (Tr. 593).   The following month, Plaintiff reported that she no longer had the new job due to nausea and lack of energy (Tr. 589).   She declined a recommendation for psychiatric treatment (Tr. 587).   She stated that she intended to have her medications "tested" (Tr. 585).

January, 2014 treating records by Dr. Florian, note Plaintiff's report of temporary relief of back pain from steroid injections (Tr. 568).   She reported level "three" pain at best and "eight" at worst (Tr. 568).   She noted that her last day of work was November 4, 2013 (Tr. 569).   Dr. Florin observed a normal gait and minimal tenderness of the lumbar spine (Tr. 569).   Plaintiff declined his recommendation to change pain medication to some with "less abuse potential" (Tr. 570).   The same month, Plaintiff reported improvement with another version of oxycodone (Tr. 577).

The following month, Dr. Florian completed a medical source statement, finding that Plaintiff was limited to walking four hours a day and sitting for unlimited periods (Tr. 612). He found that Plaintiff was limited to rare climbing, crouching, kneeling, and crawling and occasional balancing, stooping, and crouching (Tr. 612). As to the manipulative limitations, he found that she was limited to rare pushing/pulling, occasional reaching, and frequent fine and gross manipulation (Tr. 613). He found that Plaintiff experienced environmental restrictions and required a sit/stand option (Tr. 613). He found that Plaintiff's pain interfered with her concentration and would require her to take a two-hour break over the course of the workday in addition to regularly scheduled breaks (Tr. 613).

In May, 2014, Elliot B. Goldberg, M.D. noted that blood tests were mostly normal or negative (Tr. 634). He observed that "[h]er symptoms are definitely out of proportion to the physical findings" (Tr. 634, 648, 757). The same month, Dr. Florian found that Plaintiff was disabled from November, 2013 to May, 2015 due to radiculopathy, nausea, and difficulty focusing (Tr. 636-637, 727-728). He referred Plaintiff for additional steroid injections (Tr. 684).

July, 2014 treating notes state that Plaintiff appeared anxious and did not finish her sentences (Tr. 807). Treating records from the next month state that Plaintiff "would have some success" if given a chance to work (Tr. 785). Plaintiff reported that exercises recommended by physical therapy were too painful to continue (Tr. 776). Treating notes from the following month state that Plaintiff was able to arise from a sitting position easily

and appeared comfortable (Tr. 771). Plaintiff's "reported pain" was deemed worse "than her physical demeanor of pain" during office visits (Tr. 763). A September, 2014 assessment found a GAF of 60[2] due to ADHD, indigestion, and occupational problems (Tr. 822). A mental status examination was unremarkable (Tr. 824). In November, 2014, Frank Kunkel, M.D. noted bilateral positive straight leg raise, but no apparent distress (Tr. 835). The following month, Vincent J. Miele, M.D. proposed fusion surgery at L5-S1 if the conservative treatments of pain medication and steroid injections did not work (Tr. 861). A February, 2015 MRI of the cervical spine showed only mild abnormalities (Tr. 863).

## 2. Non-Treating Records

In August, 2013, Nghia Van Tran, M.D. performed a non-examining review of the treating records on behalf of the SSA, finding that Plaintiff lift 20 pounds occasionally and 10 frequently, sit, stand, or walk for a total of six fours in an eight-hour workday, and push and pull without limitation (Tr. 141). Dr. Van Tran found that Plaintiff could climb, balance, stoop, kneel, crouch, and crawl on an occasional basis and should avoid "even moderate exposure" to temperature extremes, wetness, humidity, and airborne hazards (Tr. 141-142). She concluded that Plaintiff's allegations were "partially credible" (Tr. 142).

---

[2]A GAF score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* ("*DSM-IV-TR*"), 34 (4th ed. 2000).

### 3. Evidence Submitted After the ALJ's May 18, 2015 Decision[3]

In September, 2014, Plaintiff composed a letter to a treating source, requesting that examination records stating that she exhibited paranoid tendencies be removed from her medical file.[4] *Plaintiff's Brief,* 20-23.  In November, 2014, she composed a letter to a

---

[3]Newly submitted evidence duplicating the records reviewed by the ALJ are omitted from discussion.

[4]

Sentence Six of 42 U.S.C. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ..." To satisfy the "materiality" requirement for a Sentence Six remand, a claimant "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence" *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 711 (6th Cir. 1988).

None of the newer records provide a basis for a "Sentence Six" remand.  Assuming that Plaintiff could show "good cause" for the tardy submission of the letters to treating sources, the physical therapy records and unemployment benefit findings, they would not be likely to change the ALJ's determination.  The physical therapy records suggest that Plaintiff exaggerated her level of discomfort.  *Id.* at 37.  This is consistent with May and July, 2014 treating records noting that her allegations of great pain were not supported by either the objective testing or her observed physical abilities upon examination (Tr. 634, 763, 771).

For differing reasons, Plaintiff's decision to opt for surgery nine days after the denial of benefits does not provide a basis for remand.  First, the examination notes post-date the administrative decision.  Plaintiff's condition and treatment subsequent to the date of decision is intrinsically irrelevant. *Sizemore*, 865 F.2d at 712.  The May 27, 2015 records do not suggest that Plaintiff's condition took a turn for the worse before the administrative decision was issued.  The records do not contain clinical testing or reference newer imaging studies, but simply that Plaintiff had expressed a willingness to opt for surgery.  Plaintiff's change of heart following the denial of benefits does not establish that her condition worsened before May 18, 2015.

While it is unclear whether Plaintiff deliberately submitted the newer records to "sandbag[]" the ALJ's findings,  post-decision evidence created for the purpose of "rebutting" an ALJ's decision does not satisfy the "good cause" requirement of  § 405(g). *Haney v. Astrue*, 2009 WL 700057, *6 (W.D. Ky. March 13, 2009)(*citing Thomas v.*

-11-

treating physician's assistant, defending her position that a number of the prescribed medications had caused side effects.  *Id.* at 24-27.

Plaintiff also included August, 2014 physical therapy records, *id.* at 32-39, previously submitted medical records to support her argument for remand, and a decision of the Employment Security Commission of North Carolina granting her request for unemployment benefits.  *Id.* at 50-52.   In addition, she included May 27, 2015 examination records by Dr. Miele (nine days after ALJ Kaczmarek denied benefits) which note her report that conservative treatment was not effective in relieving back pain.  *Id.* at 28-30.   The records state that she wanted to proceed with back surgery.  *Id.* at 30.

### C. Vocational Expert Testimony

VE Samuel Edelman classified Plaintiff's former work as a store/operations manager skilled at the light level of exertion and brief work as a salesclerk, unskilled/light[5] (Tr. 93).

---

*Secretary*, 928 F.2d 255, 260 (8th Cir., 1991)); *See also Ledford v. Astrue,* 311 Fed.Appx. 746, 757, 2008 WL 5351015, *10 (6th Cir. December 19, 2008)(*citing Martin v. Commissioner of Social Security*, 170 Fed.Appx. 369, 374-75, 2006 WL 509293 *5 (6th Cir. March 1, 2006)).

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience:

> [R]esidual functional capacity to perform light work . . . but with the following limits: this individual can occasionally climb ramps and stairs but never ladders, ropes, and scaffolds. Can occasionally balance, stoop, kneel, crouch and crawl and must avoid even moderate exposure to extremes of heat, cold, wetness, humidity, and environmental irritants such as fumes, odors, dust, gases, and areas of poor ventilation. With these limits, any past work? (Tr. 93).

In response, the VE testified that the above limitations would allow for Plaintiff's past relevant work (Tr. 93). The VE testified further that if the limitations were amended to include "the opportunity to alternate siting and standing every 30 minutes," the past work would be eliminated but the individual would be able to perform the exertionally light, unskilled jobs of photocopying machine operator (18,000 positions in the national economy); folding machine operator (2,900); and electrical accessories assembler (4,900) (Tr. 94). The VE testified that if the same individual were also limited to frequent (as opposed to *constant*) bilateral handling and fingering, the photo copy machine operator position would be available but the other unskilled two positions would be eliminated (Tr. 94).

The VE testified that if the same individual were limited to sedentary work (minus the restrictions on handling and fingering) she could perform the unskilled jobs of table worker (1,700); document preparer (16,000); telephone solicitor[6]; and computer trainer (Tr. 95). He added that the additional limitation of "routine, repetitive tasks" would not affect the job

---

[6]The VE did not provide job numbers for the telephone solicitor position (Tr. 95).

findings (Tr. 95). He testified that the need to be off task for more than 15 percent of the workday would eliminate all competitive employment (Tr. 95).

In response to questioning by Plaintiff's attorney, the VE testified that the bilateral handling and fingering restrictions would eliminate all of the sedentary job findings except the telephone solicitor position, but would allow for "other phone work, order taking [and] fund-raising" (Tr. 96). The VE testified further that the inability to stand or walk for more than four hours a day with rare push/pulling, climbing, crouching, and crawling and occasional balancing, stooping, and reaching with "two hours additional breaks" during the workday, along with the need to miss two days a week would eliminate all competitive employment (Tr. 97).

**D. The ALJ's Decision**

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "degenerative disc disease of the lumbar and cervical spine, connective tissue disorder/systemic lupus erthematosus, esophageal reflux disease, chronic pain, obesity, and attention deficit hyperactivity disorder ("ADHD")" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 31-35). He found that Plaintiff experienced mild restriction in activities of daily living and social functioning and moderate limitation in concentration, persistent, or pace (Tr. 36-37).

The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:

[T]his individual can occasionally engage in the climbing of ramps and/or stairs, but never ladders ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She must avoid even moderate exposure to extremes of heat, cold, wetness, humidity , and environmental irritants such as fumes, odors, dusts, gases, and poorly ventilated spaces. Also, this individual must have an opportunity to alternate from sitting and standing every 30 minutes. Further, she can frequently engage in bilateral handling and fingering. Moreover, this individual is limited to [unskilled work] requiring no more than routine and repetitive tasks (Tr. 38).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the jobs of photo copy machine operator and folding machine operator (Tr. 47, 94).

The ALJ discounted the allegations of disability, citing multiple normal physical examinations including full grip strength (Tr. 39-40). He noted that Plaintiff reported good results from steroid injections and relieved her discomfort by switching between sitting and standing positions (Tr. 39-40). He cited examination records showing a full range of motion and minimal or no postural difficulties (Tr 41). The ALJ found that Plaintiff's ability to take college classes full time, make out-of-state trips by herself, and walk without a cane or walker stood at odds with the disability claim (Tr. 41).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

"presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir.

1986)(en banc).  In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health*

*& Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the

administrative record as a whole, and may look to any evidence in the record, regardless of

whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*,

884 F.2d 241, 245 (6th Cir. 1989).

## <u>FRAMEWORK FOR DISABILITY DETERMINATIONS</u>

Disability is defined in the Social Security Act as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In

evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence,

whether the claimant: 1) worked during the alleged period of disability; 2) has a severe

impairment; 3) has an impairment that meets or equals the requirements of an impairment

listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she

can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has

the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## <u>ANALYSIS</u>

Plaintiff, proceeding *pro se*, submits that the ALJ's credibility determination includes erroneous findings. *Plaintiff's Brief,* 4-19, *Docket #14.*

First, she disputes the ALJ's finding that she overused opiate medication, asserting that medical records stating that she ran out of medicine "early" were not attributable to drug misuse. *Id.* at 4-8. However, the ALJ did not mis-characterize the August, 2014 record which states that Plaintiff had "run out" of an (allegedly) ineffective medication after refusing to take more than 20 pills in the 56-pill prescription (Tr. 42, 776). Further, the ALJ's overall finding that Plaintiff's credibility was undermined by both her preoccupation with and overuse of opiates is well supported and explained. February, 2013 records state that Plaintiff required a "gradual dose reduction of . . . narcotics" (Tr. 454). May, 2013 records state that Plaintiff experienced anxiety that she was not receiving appropriate medication (Tr. 549) and in the following month, make reference to her "escalating use of Percocet" (Tr. 532). June, 2013 records also note her "her paranoic behavior" related to her belief that others were tampering with her pills (Tr. 532). The ALJ noted that one treating source warned her that she should not take medication "any faster than prescribed" and that

-17-

if she did not like his advice, to seek treatment elsewhere (Tr. 42, 835). In August, 2013, a treating source advised Plaintiff to reduce her opiate use (Tr. 606). In January, 2014, Plaintiff rebuffed Dr. Florin's recommendation to change the pain medication to something with "less abuse potential" (Tr. 570). As discussed further below, the clinical observations and imaging studies to not support Plaintiff's professed need for aggressive opiate use. For these reasons, the ALJ did not err in concluding that Plaintiff was inappropriately preoccupied with the prescribed medications and was overusing them.

In her second argument, Plaintiff disputes the ALJ's finding that her claim of disability as of June 17, 2011 was undermined by the fact that she was subsequently "actively applying for work, claimed to be available for work, and held [herself] out [to the Employment Commission] as being 'able and willing to work during the adjudicative period'" (Tr. 43). However, the ALJ did not err in finding that Plaintiff's receipt of unemployment benefits and work activity for a portion of the relevant period undermined the disability claim (Tr. 43). *See Workman v. Commissioner of Social Sec.*, 105 Fed.Appx. 794, 801, 2004 WL 1745782, *7 (6th Cir. June 29, 2004)(*citing Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983)) (Claimant's collection unemployment benefits, requiring her to state that she is ready and able to work, while at the same time alleging disability, can be used in support of a non-disability finding). Plaintiff's efforts to secure employment and ability to attend college full time were reasonably cited to support the finding that she is not precluded from a limited range of unskilled work (Tr. 43).

-18-

Plaintiff argues third that the ALJ's finding that her claims were not credible is contradicted by her history of honesty in the workplace and her personal life. *Plaintiff's Brief* at 10-11. However, the determination that her allegations of disability were not wholly credible does not imply that Plaintiff lacked integrity in her former career or personal affairs. The ALJ found that substantial evidence, consisting of the testimony and the medical transcript, supported the finding that she was not disabled under the applicable regulations, despite her apparently sincere belief that she was unable to perform any full-time work.

It bears noting that in March, 2016, SSR 16-3p superceded SSR 96-7p, the Ruling pertaining to an ALJ's credibility determination. 1996 WL 374186 at *2 (July 2, 1996). The newer Ruling eliminates the use of the term "credibility" from SSA policy, clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1119029, *1 (Mar. 16, 2016). The newer Ruling directs ALJs to "more closely follow [the] regulatory language regarding symptom evaluation." While SSR 96-7p applies to the present determination, decided on May 18, 2015, *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 642 (6th Cir. 2006)(*accord* 42 U.S.C. § 405(a)), the "credibility determination" made by ALJ Kaczmarek should be interpreted as a finding that the subjective symptoms were not borne out by the remainder of the record rather than attack on Plaintiff's personal integrity or excellent work history.

In her last argument, Plaintiff contends in effect, that the ALJ improperly used her intermittent ability to socialize, take vacations, and attend church to support the non-disability finding. *Plaintiff's Brief* at 11-14. Plaintiff notes that she currently lacks even the

-19-

physical ability to care for her personal needs.  *Id.* at 12-14.  She is correct that a claimant's ability to perform household chores and other activities on a intermittent basis does not equate with the "ability to engage in substantial gainful activity."  *Walston v. Gardner,* 381 F.2d 580, 586 (6th Cir. 1967); *Rogers v. CSS*, 486 F.3d 234, 249 (6th Cir. 2007)).

Despite Plaintiff's claims of limitation, the ALJ noted that she was able to perform a wide variety of fairly demanding activities.  He noted that she was able to make a long car trip on her own to see her mother in Michigan and actively sought skilled employment during after the alleged onset of disability (Tr. 43).  The ALJ noted that Plaintiff's ongoing, rather than sporadic activities (such as completing a college degree since June, 2011) undermined the allegations of disability (Tr. 42).  It is well established that " '[a]n ALJ may ... consider household and social activities engaged in by the claimant in evaluating the claimant's assertion of pain or ailments.'" *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542–43 (6th Cir. 2007)(*citing Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 532 (6th Cir. 1997)).

My own review of the record shows that the credibility determination in this case is strongly supported by the clinical observations, daily activities, and the imagining studies suggesting less than disabling limitations.  The ALJ provided a five-page discussion of the medical evidence and his reasons for discounting the disability claim.  It should be noted that my finding that the administrative decision should be upheld is not intended to trivialize legitimate limitations resulting from the physical conditions.  However, based on a careful reading of this record, the ALJ's decision is within the "zone of choice" accorded to the fact-

-20-

finder at the administrative level. Pursuant to *Mullen v. Bowen*, *supra*, the ALJ's decision should not be disturbed by this Court.

## **CONCLUSION**

For the above-stated reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #16] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #14] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); and *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must

specifically address each issue raised in the objections, in the same order and labeled as

"Response to Objection #1," "Response to Objection #2," *etc.*


                    s/R. Steven Whalen
                    R. STEVEN WHALEN
                    United States Magistrate Judge

Dated: January 11, 2017


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 11, 2017, electronically and/or by U.S. mail.

                    s/Carolyn M. Ciesla
                    Case Manager